### In re IMPANELING AND INSTRUCTING THE GRAND JURY.

(*District Court, D. Oregon.* March 28, 1886.)

CONSPIRACY AGAINST LAWS OF UNITED STATES—DRIVING CHINESE OUT OF UNITED STATES—REV. ST. § 5336.

> A conspiracy or agreement of two or more persons to drive the Chinese out of the United States, or to maltreat or intimidate them, with a view of constraining them to depart therefrom, is *prima facie* a conspiracy to prevent and hinder the execution, operation, or fulfillment of a law of the United States, namely, the treaties with China of 1868 and 1880, and is an indictable offense under Rev. St. § 5336.

DEADY, J., (*charging grand jury.*) An evil spirit is abroad in this land,—not only here, but everywhere. It tramples down the law of the country and fosters riot and anarchy. Now it is riding on the

back of labor, and the foolish Issachar couches down to the burden and becomes its servant. Lawless and irresponsible associations of persons are forming all over the country, claiming the right to impose their opinions upon others, and to dictate for whom they shall work, and whom they shall hire; from whom they shall buy, and to whom they shall sell, and for what price or compensation. In these associations the most audacious and unscrupulous naturally come to the front, and for the time being control their conduct. Freedom, law, and order are so far subverted, and a tyranny is set up in our midst most gross and galling. Nothing like it has afflicted the world since the Middle Ages, when the lawless barons and their brutal followers desolated Europe with their private wars and predatory raids, until the husbandman was driven from his ravaged field, and the artisan from his pillaged shop, and the fair land became a waste.

The dominent motive of the movement is some form of selfishness, and its tendency is backward to barbarism,—the rule of the strongest, guided by no other or better precept than this: "Might makes right." This is not the time or place to inquire into the cause of this condition of society. It may be the natural outcome of the modern political economy, which, assuming that the conflict of private interests will produce economic order and right, has reduced the relation between capital and labor to the mere matter of supply and demand, and limited the duty and obligation of the one to the other to the payment of the minimum of wages for the maximum of labor on the one hand, and the getting the maximum of wages for the minimum of labor on the other. But, whatever the cause, I have faith that the teaching of experience, and the good sense and love of justice of the people, will find a remedy for the evil in time. And in the meanwhile it behooves those of us into whose hands the administration of the law and the conservation of the public peace is confided to do what we can, wisely but firmly, to prevent this evil spirit from destroying the material resources of the country, and making any improvement in the condition of society, in this respect, still more difficult and doubtful.

Lately, this spirit has been manifesting itself in Oregon, by assaulting, robbing, and driving out the helpless Chinese who are engaged among us at lawful labor for an honest living. The excuse given for this conduct is that the Chinese are taking the bread out of the mouths of their assailants by working for less wages and living cheaper than the latter can. In other words, they complain of the industry and economy of the Chinese as being beyond their competition. As we all know, this statement must be taken with much allowance. True, the Chinaman is industrious and economical, and he has the advantage of being temperate and faithful to his engagement. But he demands and gets better wages here than white men in any other part of the world, and, save in the matter of whisky and tobacco, he lives as well and is as well clad as the bulk of common laborers anywhere.

But this outcry against the Chinese as laborers is not new. It was heard from 30 to 50 years ago, when the native mobs in our eastern towns and cities undertook to drive out the comparatively "cheap labor" of Ireland and Germany, particularly the latter, that was then crowding into this country and filling the places of the slothful and shiftless. It is not necessary now to consider the right of a people to oppose or put a stop to an undesirable immigration. For my own part I have no doubt that the United States has the same right to prevent an immigration within its boundaries, of people that it deems objectionable, as it would have to repel an armed invasion by them. But this is a matter for the whole country, represented by the national government, to decide, and not for individuals or neighborhoods, or even states.

The Chinese now in this country are here under the sanction of a solemn treaty with the United States, and any attempt on the part of individuals, acting singly or in numbers, to expel them by any threat, menace, violence, or ill usage is not only wrong but unlawful. Our treaty relations with China extend over a period of more than 40 years. On July 3, 1845, a "treaty of peace, amity, and commerce" was negotiated by Caleb Cushing, on behalf of the United States. Pub. Treat. 116. By it the citizens of this country were granted the right to frequent and reside with their families, and trade, at the five ports of Kwang Chow, Amoy, Fuchow, Ningpo, and Shanghai. On June 18, 1858, William B. Read negotiated another treaty, in which the government of China agreed to defend the citizens of the United States in China "from all injury or insult of any kind." Pub. Treat. 129. To this there was a supplement, on November 8th of the same year. Pub. Treat. 137. On July 28, 1868, a treaty was negotiated by William H. Seward, containing sundry articles in addition to the last one. Pub. Treat. 147. By article 5 of this treaty "the United States and the emperor cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to the other for purposes of curiosity, of trade, or as *permanent residents*. The high contracting parties therefore join in reprobating any other than an entirely voluntary emigration for these purposes." Article 6 provides:

"Citizens of the United States visiting or residing in China shall enjoy the same privileges, immunities, or exemptions in respect to travel or residence as may there be enjoyed by the citizens or subjects of the most favored nation; and, reciprocally, Chinese subjects visiting or residing in the United States shall enjoy the same privileges and immunities and exemptions, in respect to travel or residence, as may be then enjoyed by the citizens or subjects of the most favored nation."

On November 11, 1880, another treaty concerning "immigration" was negotiated. 22 St. 826. Article 1 of this treaty gave the United

States the right to "regulate, limit, or suspend," but not to "absolutely prohibit," the coming to or residence of Chinese laborers in the United States whenever it was thought that their residence here was contrary to "the interests" of the country or endangered "the good order" thereof. Article 2 provided that Chinese, other than laborers and Chinese laborers then in the United States, "shall be allowed to go and come of their own free will and accord, and shall be accorded all the rights, privileges, and immunities and exemptions which are accorded to the citizens and subjects of the most favored nation."

Under the concession contained in this treaty congress passed the restriction act of May 6, 1882, (22 St. 58,) suspending the coming of Chinese laborers to this country for the term of 10 years from the expiration of 90 days after the date thereof.

The significance of the stipulation in the foregoing treaties with China, to the effect that the Chinese in this country shall be entitled to all the privileges and immunities that are "accorded to the citizens and subjects of the most favored nation," will be better understood by a reference to our treaty stipulations with Great Britain on that subject. By article 1 of the treaty of "commerce" with that country of July 13, 1815, (Pub. Treat. 293,) renewed and continued in force by article 4 of the treaty of October 20, 1818, (Pub. Treat. 299,) and further indefinitely continued by article 1 of the treaty of August 6, 1827, (Pub. Treat. 312,) it is provided:

"The inhabitants of the two countries, respectively, shall have liberty freely and securely to come with their ships and cargoes to all such places, ports, and rivers in the territories aforesaid [of the United States, and Great Britain in Europe] to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of the said territories, respectively."

From this brief statement of the treaties bearing on the subject, you will perceive that any attempt to compel or constrain any Chinese resident of this country to remove from or to any particular place, or to refrain from following any lawful occupation, or doing any lawful work that he may find to do, is not only morally wrong, but contrary to the law of the land. It is commonly known that during the past few weeks gangs of masked men have, in the night-time, entered the houses and camps of peaceful Chinese residents, engaged in useful labor at various points in this vicinity, and, by serious intimidation and threats of personal violence, have compelled them to leave their homes and work, and come to Portland. There is no doubt but that this brutal and inhuman conduct is a gross violation of the rights guarantied to these people by the national government through the treaties aforesaid. Nor is there any doubt of the power of congress to provide for the punishment of any person who injures, annoys, or disturbs any subject of a foreign government, resident in any part of the United States, contrary to the treaty stipulations with such government.

The powers of the national government, though limited in number and subject, are supreme in their sphere. A treaty with a foreign power is the supreme law of the land; and congress may provide a punishment for its infraction or the deprivation of or injury to a right secured by it, as in the case of an ordinary law. Without this power, the national government would be unable to keep faith with other nations. In all our external relations the individual states are unknown. The government of the Union or United States stands for all, and in this respect may enforce obedience to its authority by the prosecution and punishment of individuals who act contrary thereto.

The next question is, has congress passed any law for the punishment of persons who, contrary to the treaty stipulations, molest the subjects of foreign powers resident in this country? So far as my judgment goes, the matter is not free from doubt. I am quite clear that congress has not passed any act having this object solely and directly in view. The reason for the omission may be that heretofore it was not thought necessary, as each state could and would, in the ordinary course of justice, furnish protection to all persons living within its borders. But this illusion has been dispelled, and experience has demonstrated that unless the general government furnishes the Chinese on this coast with protection, their treaty rights may be violated with impunity. Section 5519 of the Revised Statutes is broad enough in its terms to cover the case. This is section 2 of the act of April 20, 1871, (17 St. 13,) passed to enforce the fourteenth amendment, and provides for the punishment of persons who "conspire or go in disguise upon the highway, or on the premises of another, for the purpose of depriving" any one of "the equal protection of the laws," etc.

But in *U. S.* v. *Harris*, 106 U. S. 629, S. C. 1 Sup. Ct. Rep. 601, the supreme court held that this section, as regarded the inhabitants of a state simply, was unconstitutional; that the prohibition of the amendment, as to "the equal protection of the law," was directed against the state, and not individuals, and therefore congress could not, by way of enforcing such amendment, provide for the punishment of individuals who commit such acts. Notwithstanding this decision, it has been suggested that, although this section is unconstitutional as an act to enforce the fourteenth amendment, it is valid as an act to enforce treaty stipulations guarantying a foreigner, living in any state, the protection of the laws therein. The suggestion is a plausible one, to say the least of it, but I do not feel confidence enough in it to adopt it.

Section 5336 of the Revised Statutes, which is also carved out of section 2 of the act of April 20, 1871, (17 St. 13,) to enforce the fourteenth amendment "and for other purposes," provides that—

"If two or more persons, in any state or territory, conspire to overthrow, put down, or destroy by force the government of the United States, or to levy war against them, or to oppose by force the authority thereof; *or by force to*

*prevent, hinder, or delay the execution of any law of the United States;* or by force to seize, take, or possess any property of the United States, contrary to the authority thereof,—each of them shall be punished by a fine of not less than $500 and not more than $5,000, or by imprisonment with or without hard labor for a period of not less than six months nor more than six years, or by both such fine and imprisonment."

This section has nothing to do with the fourteenth amendment, and there is no doubt of its constitutionality. It was copied into the act of 1871, aforesaid, from the act of July 31, 1861, (12 St. 284,) "to define and punish certain conspiracies" against the United States of a seditious or treasonable character. And the only question now is, does it include the acts or conduct under consideration?

Speaking only for this occasion, and reserving my final judgment until I may hear the matter fully argued, I think it does. The attempt to drive the Chinese out of the country, or to maltreat or intimidate them with a view of constraining them to depart, is *prima facie* an attempt to prevent and hinder the execution, operation, or fulfillment of a law of the United States, namely, the treaties with China of 1868 and 1880; and a conspiracy or agreement of two or more persons to engage in such conduct may, for that reason, be well characterized as a seditious and treasonable conspiracy against the authority and laws of the United States.

A mere assault, or even robbery, committed on a Chinaman, without any ulterior purpose other than a desire to vex and annoy or to steal, may not be a violation of this section. *Prima facie* such conduct is not intended to prevent the execution or operation of the law of the United States giving the Chinese the right to reside here indefinitely. But when, as I have said, the purpose of the conduct is to expel the Chinese from the country, either by direct deportation or such intimidation or violence as is likely to constrain them to go, I instruct you that the case comes within that clause in the section which makes it a crime "by force to prevent, hinder, or delay the execution of any law of the United States."

Some cases will be submitted to you by the district attorney of persons charged with mobbing and driving out Chinese in this vicinity who have been held to answer therefor before you. Take these cases and examine them carefully, and, if you find that any of the parties have maltreated, menaced, or intimidated the Chinese for the purpose or with the intent to compel or constrain them to leave the country or to remove from any place therein, it will be your duty to present them to the court for trial.

Trusting that you will do your duty in the premises, and that you will, according to the obligation of your oaths and your duty as citizens, present things truly as they come to your knowledge, without fear, favor, or affection, I commit the matter to your hands.